UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | | |
|---|---|---|
| GOLDEN HALL, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 3:23-cv-00088-GFVT |
| | ) | |
| v. | ) | |
| | ) | **MEMORADNUM OPINION** |
| TRADITIONAL SPORTING GOODS, | ) | **&** |
| *et al.*, | ) | **ORDER** |
| | ) | |
| Defendants. | ) | |

**\*\*\*   \*\*\*   \*\*\*   \*\*\***

This matter is before the Court on Hodgdon Powder Company's Motion to Dismiss. [R. 66.]  Golden Hall brought this action alleging numerous counts stemming from an accident with a muzzle loading rifle.  [R. 20.]  As a result of the accident, Hall filed suit against Traditional Sporting Goods, who manufactures and distributes the muzzleloader at issue.  [R. 20 at 2.]  Hall also filed suit against Hodgdon Powder and MTX, Inc. (formerly known as Western Powders, Inc.), both of whom manufacture and distribute the Blackhorn 209 propellant at issue in this case.  *Id.*  Hodgdon now moves to dismiss the Complaint for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2) and, in the alternative, seeks partial dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  [R. 66.]  For the following reasons, Defendant Hodgdon's Motion to Dismiss **[R. 66]** is **DENIED IN PART** and **GRANTED IN PART**.

# I

The Plaintiff purchased an inline Traditional Sporting Goods muzzle loading rifle from a vendor at Court Days in Montgomery County, Kentucky.[1]  [R. 20 at 3.]  The Plaintiff also purchased Blackhorn 209 propellant, which is marketed as an appropriate black powder substitute for use in the inline muzzleloader in this case.  *Id.* at 4.  On November 25, 2022, the Plaintiff fired the muzzleloader, equipped with Blackhorn 209 propellant, for the first time with no issues.  *Id.*  However, when the Plaintiff attempted to fire a second time, the muzzleloader misfired.  *Id.*  Due to the misfire, the Plaintiff installed a new primer on the muzzleloader, but the muzzleloader barrel detonated in the Plaintiff's hand without warning.  *Id.*  Because of the detonation, the Plaintiff sustained partial amputation of three fingers on his left hand, severe injury to his left thumb, left hand, and other injuries to his person.  *Id.*

Plaintiff filed suit against Traditional Sporting Goods, Hodgdon Powder Company, and MTX Inc. (formerly known as Western Powders Inc.).  The Plaintiff alleges that the barrel had never been proof tested and, had the barrel been properly tested, it would not have failed.  *Id.*  The Plaintiff argues that Traditional Sporting Goods, the manufacturer, was aware of the propensity of the muzzleloader to detonate.  *Id.* at 5.  Specifically, the Plaintiff claims "[t]he muzzleloader was improperly tested at the time of manufacture, and/or contained inherent defects that were dangerous to human life when used in any reasonably foreseeable manner."  *Id.*

The Plaintiff is also bringing suit against Hodgdon Powder and MTX for false representations on the Blackhorn 209 packaging, as well as failure to warn users.  *Id.* at 5–6.  Traditional Sporting Goods, Hodgdon Powder, and MTX all filed motions to dismiss.

---

[1] These facts are taken from the Plaintiff's First Amended Complaint.  [R. 20.]

Traditional Sporting Goods' partial motion to dismiss was granted.  [R. 49.]  MTX's partial motion to dismiss was granted in part and denied in part.  [R. 72.]  Hodgdon's motion to dismiss was denied without prejudice so the parties could conduct jurisdictional discovery.  [R. 50.]  With jurisdictional discovery now complete, Hodgdon has renewed its motion to dismiss based on lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2) and in the alternative Hodgdon seeks the dismissal of multiple claims pursuant to Federal Rule of Civil Procedure 12(b)(6).  [R. 66.]  Specifically, Hodgdon Powders seeks dismissal of Counts V, VII, IX, XI, XII, XIII, XIV, as well as the Plaintiff's request for punitive damages.  *Id.*

## II

Federal Rule of Civil Procedure 12(b)(2) permits a party to move for dismissal on the grounds that the court lacks personal jurisdiction.  Fed. R. Civ. P. 12(b)(2).  When a Rule 12(b)(2) motion is raised, the plaintiff carries the burden of establishing that jurisdiction is proper.  *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991).  A plaintiff cannot meet this burden by merely relying on pleadings, "but must, by affidavit or otherwise, set forth specific facts showing the court has jurisdiction."  *Id.*  In assessing whether a plaintiff has met this burden, the court must consider the pleadings and submitted materials in the light most favorable to the plaintiff and may not weigh the defendant's contrary assertions.  *Id.* at 1459.

Where, as here, if the court has not conducted an evidentiary hearing, then the plaintiff's burden is "relatively slight," and the plaintiff must only make a prima facie showing of personal jurisdiction.  *Estate of Thomson v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 360 (6th Cir. 2008); *see also Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002).  The plaintiff "can meet this burden by 'establishing with reasonable particularity sufficient contacts between [the defendant] and the forum state to support jurisdiction." *Neogen*, 282 F.3d

3

at 887 (quoting *Provident Nat'l Bank v. California Fed. Savings Loan Ass'n*, 819 F.2d 434, 437 (3d Cir. 1987)).

When sitting in diversity, "a federal court must apply the law of the state in which it sits, subject to constitutional limitations." *Reynolds v. Int'l Amateur Athletic Fed'n*, 23 F.3d 1110, 1115 (6th Cir. 1994). In Kentucky, personal jurisdiction is governed by the state's long-arm statute, codified at KRS § 454.210. [2]

Prior to the 2024 Amendment, Kentucky courts were required to apply a two-step analysis when evaluating personal jurisdiction over a non-resident defendant. First, the court must determine whether the plaintiff's cause of action arises from conduct that falls within one of the statute's nine enumerated categories. *Caesars Riverboat Casino, LLC v. Beach,* 336 S.W.3d 51, 57 (Ky. 2011). If that threshold is met, the court then proceeds to the second step: assessing whether the exercise of personal jurisdiction comports with federal due process. *Id.*; *see also KFC Corp. v. Wagstaff*, 502 B.R. 484, 495 (W.D. Ky. 2013); *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1262 (6th Cir. 1996).

## A

The Court begins its analysis with the first step of Kentucky's pre-amendment *Caesars Riverboat* two-step framework for determining personal jurisdiction. Step one requires the Court to assess whether the claim satisfies Kentucky's long-arm statute, KRS § 454.210, which enumerates nine specific bases for asserting jurisdiction over an out-of-state defendant. *See* Ky. Rev. Stat. Ann. § 454.210(2)(a). Step two instructs that jurisdiction is limited to claims that "*arise from*" one of the listed categories. *Id.* The Kentucky Supreme Court explained that the

---

[2] Plaintiff Hall cites the amended version of KRS § 454.210 in his response to Hodgdon's motion to dismiss. However, because the Court must apply the version of the statute in effect at the time the complaint was filed, and because subsections (1) and (3) through (5) are not materially different from their counterparts in the amended statute, the Court relies here on the pre-amendment version of KRS § 454.210(2)(a)(1), (3)-(5).

phrase "arising from" in the long-arm statute should be interpreted to mean that the "cause of action must have originated from, or came into being, as a result of" the defendant's activities which fit into the categories listed in KRS 454.210. *Caesars Riverboat Casino*, 336 S.W. 3d at 58. Thus, even when the defendant's conduct falls within one of the enumerated categories in the long-arm statute, the plaintiff's claim still must *arise from* that conduct in order for personal jurisdiction to exist. *Id.* at 58–59 ("[T]he wrongful acts of the defendant alleged in the plaintiff's complaint must originate from the actions or activities that form the applicable statutory predicate for assertion of long-arm jurisdiction.")

Hall broadly asserts that jurisdiction is proper under "any number of subsections" of the long-arm statute, but identifies four specific provisions that he contends apply:

1. Transacting any business in this Commonwealth;
2. [omitted]
3. Causing tortious injury by an act or omission in this Commonwealth;
4. Causing tortious injury in this Commonwealth by an act or omission, including but not limited to designing, manufacturing, or marketing products, including product components, outside this Commonwealth, which are used or consumed in this Commonwealth or regularly available for purchase in this Commonwealth if he or she does or solicits business, or engages in any other course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this Commonwealth
5. Causing injury in this Commonwealth to any person by breach of warranty expressly or impliedly made in the sale of goods outside this Commonwealth when the seller knew such person would use, consume, or be affected by, the goods in this Commonwealth, if he or she also does or solicits business, or engages in any other course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this Commonwealth;

[R. 69 at 9.]; Ky. Rev. Stat. Ann. § 454.210(2)(a)(1), (3)–(5).

In response, Defendant Hodgdon contends that Hall's complaint fails to clearly identify which subsection of KRS § 454.210(2)(a) applies to it specifically. [R. 66 at 4.] Hodgdon suggests that, at most, subsection (a)(4) might be implicated, but argues that it is ultimately inapplicable. *Id.* Hodgdon maintains that Hall's claims do not "arise from" any out-of-state

conduct by Hodgdon, because the company neither sold nor distributed the specific Blackhorn 209 canister alleged to have caused the injury in this case.  *Id.*

Further, Hodgdon argues that it is not subject to jurisdiction under subsections (a)(1) or (a)(3), which concern transacting business in Kentucky and causing injury through conduct occurring within the state, respectively.  [R. 66 at 5.]  Hodgdon points out that Hall's amended complaint contains no allegations that Hodgdon acted within Kentucky in any capacity.  *Id.*[3]  Lastly, Hodgdon argues that even if it had engaged in relevant conduct, Hall's injuries did not "arise from" such conduct, either in or outside the state of Kentucky, as it was not involved in the manufacture, production, packaging, marketing, or sale of the particular Blackhorn 209 canister at issue.  *Id.* at 6.

**1**

Between the *Caesars Riverboat* decision and the July 2024 amendments to KRS § 454.210, there remained "little [state] case law interpreting the meaning of 'transacting business' as used in [Ky. Rev. Stat. §] 454.210(2) . . . ."  *Gentry v. Mead*, No. 16-100-DLB-CJS, 2016 WL 6871252, at *3 (E.D. Ky. Nov. 21, 2016).  During this interim period, however, courts in Kentucky applied varying interpretations of KRS § 454.210(2)(a)(1).

As this Court has found in the past, a more functional test is appropriate.  *See Estate of Gibson by & through Shadd v. Daimler N. Am. Corp.,* 638 F. Supp. 3d 735, 746 (E.D. Ky. 2022). This test asks whether the defendant engaged in "a course of direct, affirmative actions within a forum that result in or solicit a business transaction."  *Gentry*, 2016 WL 6871252, at *3 (quoting *Modern Holdings, LLC v. Corning, Inc.*, No. 13-cv-405, 2015 WL 1481443, at *6 (E.D. Ky.

---

[3] This is the only reference Hodgdon makes to subsection (a)(1) in its motion to dismiss. In contrast, Hall's response dedicates substantial argument to asserting that Hodgdon's conduct satisfies subsection (a)(1), including specific references to alleged business transactions conducted within the Commonwealth which are discussed further down. *See* [R. 69 at 10–12.]

Mar. 31, 2015)).  Under this approach, isolated or minimal actions do not suffice.  *See id*.

Conversely, a defendant that establishes a physical office in Kentucky, employs individuals

working within the Commonwealth, and compensates those individuals for in-state activity, has

clearly "transacted business" within the meaning of the statute.  *See id.*

 Applying this approach here, the Court notes that Hodgdon is incorporated in Kansas and

there is no evidence that Hodgdon has any offices, employees, or physical location of its own in

Kentucky.  [R. 20 at 2.]  Nevertheless, Hall has presented evidence demonstrating Hodgdon's

connections to the Commonwealth. These contacts include Hodgdon's own online

advertisements indicating that it ships products nationwide, including to all fifty states.  [R. 69 at

10–11; 69-8.]  Additionally, Hall has submitted exhibits demonstrating that Hodgdon products

are available for purchase at multiple retail locations throughout Kentucky, including both

national chain stores and smaller independent dealers.  [R. 69-9; 69-14 at 3.]

 Deposition testimony from a Hodgdon official clarifies that, at least with regard to

national retail dealers, Hodgdon ships its products to centralized distribution warehouses located

presumably outside the state of Kentucky.  [R. 69-14 at 3–5.]  The national retailers then

independently determine which states and specific stores receive Hodgdon products.  *Id.* While

Hodgdon's products are ultimately stocked in Kentucky stores, Hodgdon itself exercises no

control over where the products are sent once delivered to the distribution center.  *Id.*  Prior to

the 2024 amendment to Kentucky's long-arm statute, Kentucky courts had not directly addressed

whether such indirect distribution models constitute "transacting any business in this

Commonwealth" under KRS § 454.210(2)(a)(1).

 Possible comparison arises from this Court's decision in *Estate of Gibson*, in which no

personal jurisdiction was found where the defendant, Lufkin Industries, sold its products to a

Georgia-based distributor, who then, in turn, independently sold and shipped products to a retailer in Kentucky.  638 F. Supp. 3d at 746.  This Court concluded that this indirect distribution channel did not amount to transacting business in the state.  *Id.*  However, the present case differs slightly because unlike *Estate of Gibson*, where Lufkin's direct customer (NorthStar) was separate and distinct from the ultimate Kentucky retailer (Lowe's), here, Hodgdon directly sells its products to dealers and retailers, which subsequently distributes those products into Kentucky from their own central warehouses.  [R. 69-14 at 3–5.]

Moreover, in *Gregory v. EzriCare, LLC*, this Court found personal jurisdiction when the defendant contracted directly with distributors identified as "Wal-Mart and Amazon distributors in Kentucky," although it is not specified whether product shipments went directly to Kentucky stores or through central warehouses located outside of the state.  No. CV 23-69-DLB-CJS, 2024 WL 2279165, at *4 (E.D. Ky. May 20, 2024).  While the facts in *Gregory* are not fully analogous, the opinion supports the notion that a defendant's established supply relationships with Kentucky-serving retailers may, in some circumstances, suffice.

Additionally, Hall provides evidence that Hodgdon has engaged in direct online transactions, making six documented sales to individual Kentucky customers between 2022 and 2023, shipping products directly from Kansas to Kentucky.  [R. 69-12; 69-13.]  Hall also identifies that Hodgdon maintains relationships with two original equipment manufacturers (OEMs) located in Kentucky.  [R. 69-14 at 5–6.]  However, the only documented OEM-related transaction occurred in 2023 with one of the two OEMs and zero transactions occurring between Hodgdon and either OEM in 2022.  *Id.*

Courts have approached such attenuated contact with caution when determining whether they rise to a sufficient "course of direct, affirmative actions within a forum that result in or

solicit a business transaction." *Compare Modern Holdings*, 2015 WL 1481443, at *6 ("Isolated actions are insufficient."); *Churchill Downs,* No. 3:14–CV–166–H, 2014 WL 2200674 at *6 (W.D. Ky. 2014) (explaining that one isolated contract is insufficient); *and Calphalon Corp. v. Rowlette,* 228 F .3d 718, 722 (6th Cir.2000) ("[T]he mere existence of a contract . . . is insufficient to confer personal jurisdiction over [a non-resident defendant]") *with KFC Corp. v. Wagstaff,* No. 3:11–CV–00674–CRS, 2013 WL 3166165 at *496 (W.D. Ky.2013) (numerous long-term contracts with Kentucky-based franchisor were sufficient). Here, the seven total direct transactions with consumers and an OEM between 2022 and 2023 are indeed more than a single isolated action, but they also do not rise to the level of numerous or long-term action that courts have previously deemed sufficient. While the total number of documented transactions is not extensive, the evidence reflects multiple forms of commercial engagement: direct online sales, product availability at in-state retailers, and business relationships with OEMs located in Kentucky.[4]

In short, while this is not a case involving deep or sustained in-state operations, the record does reflect deliberate and multi-channel commercial activity aimed, at least in part, at Kentucky consumers. Hodgdon made its products available for purchase in the Commonwealth, engaged in several direct online sales to Kentucky residents, and maintained some level of relationship with Kentucky-based OEMs and retailers. At this stage, Hall's burden to establish a prima facie case for personal jurisdiction is light, and, as such, the Court finds that Hall has established a sufficient basis under KRS § 454.210(2)(a)(1).

**2**

---

[4] As of the date of this Order, Hall has not submitted any exhibits showing evidence of additional direct shipments from Hodgdon to Kentucky-based customers or transactions with its OEM customers beyond the seven transactions referenced. Moreover, Hall does not allege the existence of any other such transactions in his response to Hodgdon's motion to dismiss. Accordingly, the Court assumes that no further direct transactions have occurred.

In *Caesars*, the Kentucky Supreme Court explained that a court may not exercise jurisdiction "simply because [the non-resident defendant] has engaged in conduct or activity that fits within one or more subsections of KRS § 454.210(2)(a).  The plaintiff must also show that his claim is one that *arises from* the conduct or activities described in the subsection."  336 S.W.3d at 55 (emphasis added).

The court interpreted "arises from" to mean that that the claim must have "originated from, or came into being" as a direct consequence of the defendant's Kentucky activities, and there must be a "reasonable and direct nexus" between those activities and the statutory category invoked.  *Id.* at 59.  The court further explained that "[w]hether such a connection exists will often be self-evident, especially when the claim is based upon tortious injury that occurs in this state or upon contracts to supply goods in this state."  *Id.* at 59.  However, because the universe of fact patterns is "limitless," the inquiry is necessarily case-specific and guided by "common sense."  *Id.*

Here, Hall contends that his claims "arise out of Hodgdon's decision to transact business in the Commonwealth and their failure to make sufficiently safe products."  [R. 69 at 12.] Hodgdon, in response, asserts that it had no involvement in the manufacture, packaging, marketing, or distribution of the specific Blackhorn 209 canister that allegedly caused Hall's injuries.  [R. 66 at 6.]  According to Hodgdon, the lot number affixed to the canister indicates it was packaged and shipped on May 12, 2020, by Western Powders, Inc. (now known as MTX, Inc.).  *Id.*  Hodgdon further argues that it did not acquire any rights to Blackhorn 209 propellant until September 30, 2020, more than four months after the specific canister in question entered the stream of commerce, pursuant to an Asset Purchase Agreement with MTX/Western Powders.  [R. 66 at 3.]

Applying *Caesars*, it would seem that Hall cannot satisfy the "arising from" requirement. Hodgdon has presented evidence that Hall's claims stem from the alleged defect in a product manufactured, packaged, and placed into the stream of commerce by MTX, not Hodgdon. [R. 7-1.] At most, Hodgdon's Kentucky contacts consist of generic sales activity after it purchased the Blackhorn 209. Accordingly, the present record shows no "reasonable and direct nexus" between Hodgdon's own activities in Kentucky and the specific canister that injured Hall. Under *Caesars*, that disconnect would ordinarily foreclose jurisdiction.

However, an unresolved issue remains: if Hodgdon's September 30, 2020, Asset Purchase Agreement expressly, or by operation of law, assumed MTX's Blackhorn 209 liabilities, then MTX's pre-sale contacts with Kentucky could be imputed to Hodgdon. In that event, Hall could satisfy the "arising from" prong because his claims would originate from the very sales and distribution activities MTX/Western Powders undertook in the Commonwealth, liabilities for which Hodgdon may now bear.[5]

Under Kentucky law, the general rule is that a corporation that purchases the assets of another does not assume the seller's liabilities. *Pearson ex rel. Trent v. Nat'l Feeding Sys., Inc.*, 90 S.W.3d 46, 49 (Ky. 2002). However, courts recognize four exceptions to this rule:

1. Where the purchaser expressly or impliedly agrees to assume the seller's debts or liabilities;
2. Where the transaction amounts to a de facto merger or consolidation;
3. Where the purchaser is merely a continuation of the selling corporation; or

---

[5] Hall argues, both in the opening paragraphs of his response and again in his Due-Process discussion, that, under the September 30, 2020, Asset-Purchase Agreement, Hodgdon expressly "assumed the liabilities of Defendant Western Powders, Inc." for Blackhorn 209. *See* [R. 69 at 5–7, 13–14.] On that basis he contends MTX's pre-sale contacts with Kentucky should be imputed to Hodgdon for purposes of personal jurisdiction. *Id.* Although Hall never expressly links this successor-liability theory to the Kentucky long-arm statute, he states in conclusory fashion that his claims "arise out of Hodgdon's decision to transact business in the Commonwealth and [its] failure to make sufficiently safe products." *Id.* at 12. Because Hall offers no additional facts tying Hodgdon's own Kentucky conduct to the canister at issue, the Court understands his position to be that the "arising from" element of KRS § 454.210(2)(a) can be satisfied only if MTX's contacts are imputed to Hodgdon under principles of successor liability.

4. Where the transaction is entered into fraudulently for the purpose of escaping liability.

*Id.*  Here, in the September 30, 2020, Asset Purchase Agreement between Hodgdon and MTX, Hodgdon expressly agreed to assume MTX's liabilities "with respect to any products manufactured by [the company producing Blackhorn 209 powder] and sold by [MTX/Western Powders] prior to Closing."  [R. 68-2 at 3.]  Hodgdon's express assumption clause places this transaction squarely within the first *Pearson* exception.  By agreeing to bear responsibility for "any products manufactured . . . and sold . . . prior to Closing," Hodgdon necessarily accepted liability for any pre-closing contacts of Blackhorn 209 powder canisters in Kentucky, including the canister shipped on May 12, 2020.  The sales and distribution activities that introduced the canister into the Commonwealth would therefore be treated as Hodgdon's own for purposes of the long-arm statute, satisfying the "arising from" requirement.

Accordingly, the Court concludes that although Hodgdon's own contacts with Kentucky do not give rise to Hall's claims, the express assumption of liability in the Asset Purchase Agreement creates a sufficient basis, at least at this stage, to find that Hall's claims arise from conduct falling within KRS § 454.210.  The question of whether Hodgdon is ultimately liable for MTX's conduct remains for resolution on the merits, but for jurisdictional purposes, the "arising from" requirement is satisfied.

**B**

The Court now turns to the second step of the pre-amendment *Caesars Riverboat* analysis; determining whether exercising jurisdiction over the non-resident defendant comports with federal due process.  *Caesars Riverboat Casino*, 336 S.W.3d at 57.  Due process requires that a defendant have "certain minimum contacts with [the forum] such that the maintenance of

12

the suit does not offend 'traditional notions of fair play and justice.'" *International Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463 (1940)).

Personal jurisdiction may be either specific or general. *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 549 (6th Cir. 2007). General jurisdiction exists when a defendant's affiliations with the forum state are "continuous and systematic as to render them essentially at home in the forum State." *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014) (internal quotations and citations omitted). Specific jurisdiction, on the other hand, exists when a cause of action arises from or relates to the defendant's contacts with the forum. *Air Prods.*, 503 F.3d at 550.

The Sixth Circuit has established a three-prong test for determining whether specific jurisdiction exists:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Id.*

In this case, Hall asserts that both specific jurisdiction and general jurisdiction are present. [R. 69 at 12.] However, because the Court concludes that specific jurisdiction is present, it need not address the question of general jurisdiction. *Air Prods.*, 503 F.3d at 550 ("Because we ultimately conclude that the district court had specific jurisdiction over Defendants, we focus only on that question and do not reach the question of general jurisdiction."). The Court now turns to the specific jurisdiction analysis.

### 1

The bedrock of the constitutional analysis is the first factor, purposeful availment, which the Sixth Circuit calls the "*sine qua non* for in-personam jurisdiction." *Air Prods.*, 503 F.3d at

550 (quoting *S. Mach. Co. v. Mohasco Indus., Inc.,* 401 F.2d 374, 381–82 (6th Cir.1968)). Purposeful availment requires more than mere awareness that one's products or services may find their way into the forum state. *See Neogen Corp. v. Neo Gen Screening, Inc.,* 282 F.3d 883, 891 (6th Cir.2002). Rather, it entails "something akin to a deliberate undertaking to do or cause an act or thing to be done in [the forum state] or conduct which can be properly regarded as a prime generating cause of the effects resulting in [the forum state], something more than a passive availment of [the forum state's] opportunities." *Id.* (internal citation and quotation omitted).

This requirement is satisfied where the defendant's contacts with the forum state "proximately result from actions by the defendant *himself* that create a 'substantial connection' with the forum State" and where the defendant's conduct and relationship with the forum are such that they "should reasonably anticipate being haled into court there." *CompuServe, Inc. v. Patterson,* 89 F.3d 1257, 1263 (6th Cir.1996) (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474–75 (1985)). The emphasis is on whether the defendant has engaged in "some overt actions connecting [it] with the forum state." *Dean v. Motel 6 Operating L.P.,* 134 F.3d 1269, 1274 (6th Cir.1998). In particular, where a defendant "has created 'continuing obligations' between himself and the residents of the forum, he manifestly has availed himself of the privilege of conducting business there." *Burger King Corp,* 471 U.S. at 476. If a plaintiff can demonstrate that the defendant purposefully availed itself of the privilege of conducting activities within the forum, the absence of physical contacts will not defeat jurisdiction. *See Burger King,* 471 U.S. at 476; *CompuServe,* 89 F.3d at 1265.

Further, with respect to the "arising from" prong, the Sixth Circuit has articulated the standard in various ways, asking, for example, whether the cause of action was "made possible

14

by" or "lies in the wake of" the defendant's forum contacts, or whether the claim is "related to" or "connected with" those contacts. *Air Prods.*, 503 F.3d at 553. The Sixth Circuit has emphasized that this is a "lenient standard," requiring only a minimal causal connection between the defendant's in-state conduct and the plaintiff's claims. *Id.*

Taken together, for the same reasons articulated in the above sections concerning Kentucky's long arm statute, the Court finds that Hall has adequately established the purposeful availment prong of the specific jurisdiction test. Hall has pointed to Hodgdon's deliberate engagement with the Kentucky market through direct online sales to Kentucky consumers, product availability in Kentucky retail stores, OEM relationships, and nationwide marketing that included the Commonwealth. [R. 69 at 12–13.] These actions, while limited in number, constitute sufficient intentional conduct directed at the forum state. Moreover, Hall alleges that Hodgdon expressly assumed liability for Blackhorn 209 products previously sold by MTX, including the specific canister at issue in this case. [R. 69 at 7.] By contractually agreeing to bear liability for those products, Hodgdon may have effectively stepped into the shoes of MTX, including any jurisdictional consequences arising from MTX's distribution of the product into Kentucky.

## 2

With respect to the second prong, the Court notes that Hodgdon itself did not manufacture, package, or distribute the specific canister at issue. Rather, the product was shipped into Kentucky by MTX several months before Hodgdon's acquisition. Standing alone, Hodgdon's post-acquisition conduct would not satisfy the "arising from" requirement. However, as discussed above, Hall has presented evidence that Hodgdon expressly assumed liability for

15

Blackhorn 209 products sold prior to the acquisition.  [R. 68-2 at 3.]   As a result, MTX's conduct may be imputed to Hodgdon.

Therefore, the express assumption of liability in the Asset Purchase Agreement creates a sufficient basis, at least at this stage, to conclude that MTX's contacts with Kentucky are attributable to Hodgdon, thereby satisfying the federal due process "arising from" requirement. Whether Hodgdon is ultimately liable for MTX's conduct remains a question for the merits.  But for purposes of the jurisdictional analysis, the Court finds that both the purposeful availment and arising from prongs are satisfied.

### 3

Finally, the Court finds that exercising personal jurisdiction over Hodgdon is reasonable. Under the third prong of the specific jurisdiction analysis, "the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable."  *Air Prods.*, 503 F.3d at 554 (quoting *S. Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968)). "[W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable."  *Burger King Corp.,* 471 U.S. at 477. Moreover, where, as here, the first two criteria are met, a presumption of reasonableness is created and "only the unusual case will not meet this third criteria."  *Theunissen,* 935 F.2d at 1461 (internal quotations and citations omitted).  In evaluating reasonableness, courts consider: (1) the burden on the defendant; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; and (4) the shared interest of the

several states in furthering fundamental substantive social policies. *Air Prods.*, 503 F.3d at 554

(quoting *Intera Corp. v. Henderson,* 428 F.3d 605, 618 (6th Cir.2005)).

Here, Hodgdon has not demonstrated that litigating in Kentucky would impose an undue

burden.  Kentucky has a strong interest in providing a forum for alleged injuries caused by

defective products sold to residents of the state.  Hall, as a Kentucky resident, has a clear and

legitimate interest in pursuing relief in his home forum.  Moreover, requiring Hall to litigate this

matter in another state would impose a significant burden, as he has no meaningful ties to any

other jurisdiction.  Under these circumstances, the Court concludes that asserting personal

jurisdiction over Hodgdon comports with Due Process.

## C

Having resolved the matter of personal jurisdiction, the Court turns next to the Motion to

Dismiss.  A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of a plaintiff's

complaint.  In reviewing a Rule 12(b)(6) motion, the Court "construe[s] the complaint in the

light most favorable to the plaintiff, accept[s] its allegations as true, and draw[s] all inferences in

favor of the plaintiff." *DirecTV, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).  The Court,

however, "need not accept as true legal conclusions or unwarranted factual inferences." *Id.*

(quoting *Gregory v. Shelby Cnty.*, 220 F.3d 433, 446 (6th Cir. 2000)).

## 1

Hall first alleges in Count V that Hodgdon "failed to exercise reasonable care to warn the

Plaintiff of the dangerous condition, or of the facts which made it likely that Plaintiff would

encounter the dangerous condition in the normal and foreseeable use of Blackhorn 209

propellant powder during the shooting of the Muzzleloader."  [R. 20 at 13.]  For a Kentucky

failure to warn claim, a plaintiff must plead facts which plausibly establish that: (1) the defendant

had a duty to warn of the product's alleged dangers; (2) the defendant provided warnings that were inadequate; and (3) the inadequacy of the warning must have proximately caused the plaintiff's injuries. *See Stewart v. Gen. Motors Corp.*, 102 Fed. Appx. 961, 964 (6th Cir. 2004); *Corder v. Ethicon, Inc.*, 473 F. Supp. 3d 749, 757 (E.D. Ky. 2020). Thus, in order to survive dismissal, a plaintiff must allege facts showing that "the lack of adequate warnings made the product defective and unreasonably dangerous." *Naiser v. Unilever U.S., Inc.*, 975 F. Supp. 2d 727, 746 (W.D. Ky. 2013); *Shea v. Bombardier Rec. Prods., Inc.*, 2012 WL 4839527, at *3 (Ky. App. Oct. 12, 2012).

Hodgdon argues, and the Court agrees, that Hall's failure to warn claim is not independently alleged, but rather is derivative of the asserted manufacturing or design defect. [R. 66 at 11; R. 20 at 12–13.] In substance, Hall claims that the accident occurred because the product was defectively manufactured or designed, *not because of any failure to warn*. [R. 20 at 12.] The Complaint contains no plausible factual allegations connecting the alleged injury to the absence or inadequacy of a warning, nor does it explain how a different warning might have prevented the harm. Because Hall has failed to state a claim upon which relief can be granted, Count V is dismissed as to Defendant Hodgdon.

**2**

Count VII alleges that Hodgdon "breached the implied warranty of merchantability by placing a defectively designed, manufactured, and tested the Blackhorn 209 propellant powder in the stream of commerce that was ultimately sold to Plaintiff." [R. 20 at 15.] Under Kentucky law, "privity of contract between the parties is prerequisite to a claim for breach of warranty." *Brown Sprinkler Corp. v. Plumbers Supply Co.*, 265 S.W.3d 237, 240 (Ky. App. Ct. 2007). It is well established that "privity of contract does not extend beyond the buyer-seller setting, and an

intervening purchaser destroys privity." *Gaunce v. CL Medical Inc.*, No. 5:14-346-DCR, 2015 WL 893569, at *2 (E.D. Ky. Mar. 2, 2015) (citing *Compex Int'l Co. v. Taylor*, 209 S.W.3d 462, 465 (Ky. 2006)).

Here, while it is true that privity of contract is a prerequisite for a breach of the implied warranty of merchantability, it is not yet clear the status of privity between the Hall and Hodgdon.  The Amended Complaint only states the "Plaintiff also purchased Blackhorn 209 propellant."  [R. 20 at 4.]  While existence of privity between Hodgdon and Hall may be unlikely, the Court is required to draw all reasonable inferences in the light most favorable to the Plaintiff.  *DirecTV, Inc.*, 487 F.3d at 476.  As such, the Court finds that at this early stage in the proceeding, there is at least a possibility of privity of contract between Hodgdon and Hall.  Accordingly, Count VII remains.

### 3

Count IX asserts that Hodgdon violated the Kentucky Consumer Protection Act (KCPA) by engaging in conduct that was "unfair, false, misleading, or deceptive . . . in the course of trade or commerce."  [R. 20 at 16.]  The KCPA provides a private right of action to individuals who purchase or lease goods or services for personal use and suffer injury as a result of a seller's prohibited practices.  *See* KRS § 367.220(1).

As with Hall's implied warranty claim, a KCPA claim requires privity of contract between the parties.  *Skillcraft Sheetmetal, Inc. v. Ky. Mach., Inc.*, 836 S.W.2d 907, 909 (Ky. Ct. App. 1992); *see also Blanton v. Remington Arms Co., LLC*, No. 7:20-CV-71-REW-EBA, 2022 WL 4125071, at *5 (E.D. Ky. Sept. 9, 2022).  However, because the Court must construe the facts as they stand in the light most favorable to the Plaintiff, Count IX remains.

### 4

Count XI asserts that Hodgdon is liable under the doctrine of *res ipsa loquitur*. [R. 20 at 18.] Under Kentucky law, a plaintiff invoking *res ipsa loquitur* must establish that: (1) the defendant had exclusive control of the instrumentality that caused the injury; (2) the nature of the accident is such that it would not ordinarily occur in the absence of negligence; and (3) the injury resulted from the accident itself. *Vernon v. Gentry*, 334 S.W.2d 266, 268 (Ky. 1960). Hodgdon correctly notes that *res ipsa loquitur* is an evidentiary doctrine, not a standalone cause of action. [R. 66 at 13.] It is well settled that *res ipsa* is a method of proving negligence, but it is not an independent claim. *See Taylor v. Jackson*, No. 3:13CV1088-S, 2014 WL 4494254 (W.D. Ky. Sept. 10, 2014); *Bryan v. CorrectCare-Integrated Health, Inc.,* 420 S.W.3d 520, 524 (Ky. Ct. App. 2013); *Barbour v. Menard, Inc.*, 2016 WL 6603947, at *2 (W.D. Ky. 2016) (finding that "the lack of inclusion [of *res ipsa loquitur*] within a complaint does not preclude a plaintiff from presenting the theory," clearly illustrating that *res ipsa loquitur* is not meant to be a standalone claim). The claim is negligence; *res ipsa loquitur* is a potential method of proving it. Accordingly, because *res ipsa loquitur* is not a freestanding cause of action, Count XI must be dismissed.

**5**

Count XII alleges that Hodgdon fraudulently concealed that the Blackhorn 209 propellant used by the Plaintiff was "allegedly designed, tested, manufactured, imported, and sold" by its predecessor, MTX (formerly known as Western Powders Inc.). [R. 20 at 20–21.] According to the Complaint, the Plaintiff was unaware of MTX's alleged role in connection with the propellant until Hodgdon filed its motion to dismiss. *Id.* Defendants correctly indicate fraud claims are subject to Federal Rule of Civil Procedure 9(b)'s heightened pleading standard for fraud claims. [R. 66 at 15.]; Fed. R. Civ. P. 9(b).

20

Ordinarily, claims challenged under 12(b)(6) must satisfy the familiar "plausibility" standard. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). But the pleading standard for a fraud plaintiff is heightened. Specifically, the fraud plaintiff "must state with *particularity* the circumstances constituting fraud[.]" Fed. R. Civ. P. 9(b) (emphasis added). To plead with particularity, the plaintiff must provide "the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Coffey v. Foamex L.P.*, 2 F.3d 157, 161–62 (6th Cir. 1993) (internal citation omitted). "When the complaint involves multiple defendants, then 'each defendant's role must be particularized with respect to their alleged involvement in the fraud.'" *Anderson v. Pine S. Cap., L.L.C.*, 177 F. Supp. 2d 591, 596–97 (W.D. Ky. 2001) (internal citation omitted). The purpose of this requirement is to "place[ ] the defendant on 'sufficient notice of the misrepresentation'" so that the defendant may respond in an "informed" fashion. *Coffey*, 2 F.3d at 162 (quoting *Brewer v. Monsanto Corp.*, 644 F. Supp. 1267, 1273 (M.D. Tenn. 1986)).

In Kentucky, a fraudulent concealment claim requires that a plaintiff establish four elements by clear and convincing evidence: (1) the defendant had a duty to disclose the material fact at issue, (2) the defendant failed to disclose the fact, (3) the defendant's failure to disclose the material fact induced the plaintiff to act and; (4) the plaintiff suffered actual damages as a consequence. *Rivermont Inn, Inc. v. Bass Hotels & Resorts, Inc.*, 113 S.W.3d 636, 641 (Ky. App. 2003); *see generally Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938) (federal courts sitting in diversity apply state substantive law and federal procedural law).

Here, Hodgdon argues, and the Court agrees, that Hall's amended complaint fails to allege facts sufficient to support this claim. [R. 66 at 15; R. 71 at 12.] In Kentucky, "mere

silence does not constitute fraud by omission where it relates to facts open to common observation or discoverable by the exercise of ordinary diligence, or where means of information are as accessible to one party as to the other." *Giddings & Lewis, Inc. v. Indus. Risk Insurers*, 348 S.W.3d 729, 749 (Ky. 2011). Hall asserts that only Hodgdon had access information that would identify MTX/Western Powders as the manufacturer of the propellant. [R. 69 at 22–23.] However, the canister in Hall's possession prominently displays the name "Western Powders" on its label, and nowhere does it mention "Hodgdon." [R. 69-3.] Hall therefore had direct access to the very information he claims was concealed.

Further, Hall fails to identify any specific damage he incurred as a result of this alleged concealment. Under both Rule 9(b) and Kentucky law, a fraud plaintiff must allege with particularity the injury suffered as a consequence of the misrepresentation or omission. *Coffey*, 2 F.3d at 161–62; *Rivermont*, 113 S.W.3d at 641. The Complaint does not specify as to what, if any, harm Hall suffered due to not knowing MTX/Western Powder's role in the manufacturing process. Without plausible allegations of actual, concrete injury tied to the alleged concealment, the claim cannot survive. Accordingly, Count XII must be dismissed.

**6**

Count XIII alleges that Hodgdon and MTX were acting individually and in concert with one another while engaging in the negligent acts and omissions set forth in the complaint. [R. 20 at 21.] Kentucky recognizes the theory of concert of action, having adopted the framework set forth in the *Restatement (Second) of Torts*. *See Farmer v. City of Newport*, 748 S.W.2d 162 (Ky. Ct. App. 1988). Under that standard, a defendant is subject to liability for harm caused by another's tortious conduct if the defendant:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he (a) does a tortious act in concert with the other or pursuant to a common

22

design with him, or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct separately considered, constitutes a breach of duty to the third person.

*Id.* at 164 (quoting *Restatement (Second) of Torts*, § 876).

To adequately plead a concert of action claim in a product liability case, the plaintiff must allege specific facts showing how the defendants acted jointly or cooperatively. *See Smith v. Univar USA, Inc.*, No. 12-134-ART, 2013 WL 1136624, at *5 (E.D. Ky. Mar. 18, 2013). This requires three showings: (1) the plaintiff must identify the product causing the harm; (2) the plaintiff must establish that the defendants cooperated or acted with concerted effort; and (3) the plaintiff must prove defendants contravened a particular standard of care. *Red Hed Oil, Inc. v. H.T. Hackney Co.*, 292 F. Supp. 3d 764, 776 (E.D. Ky. 2017); *Eastridge v. Goodrich Corp.*, No. 3:12CV862-S, 2014 WL 4916236, at *3 (W.D. Ky. Sept. 30, 2014). "Allegations of mere parallel activity of two or more defendants, without more, are insufficient to prove defendants acted by cooperative or concerted activities under the concert of action theory." *Brown v. Arch Wood Prot., Inc.*, 265 F.Supp.3d 700, 709 (E.D. Ky. Sept. 26, 2017). A plaintiff must point to specific evidence or facts "suggesting an agreement or common design between the defendants." *Id.*

Hodgdon argues, and again the Court agrees, that Hall's claim of concert of action lacks sufficient specificity to adequately plead such a claim. Hall's concert of action claim consists of two paragraphs with the operative paragraph stating, "[A]t all times relevant hereto, each Defendant Hodgdon and Defendant MTX was acting individually and in concert with each other Defendant while engaging in the negligent act and omissions set forth in this complaint." [R. 20 at 21.]

Hall's claim of concerted action does not meet the bar set in *Farmer v. City of Newport*. In *Farmer*, the plaintiffs faced genuine uncertainty over which of almost 100 mattress makers produced the defective mattress that ignited their apartment fire. They nevertheless survived dismissal because they alleged, *with detail*, that those manufacturers "acted in concert . . . through the National Association of Bedding Manufacturers . . . to withhold from public consumers information regarding the dangerous nature of mattresses." 748 S.W.2d at 164. In other words, the plaintiffs in *Farmer* "alleged facts that defendants acted cooperatively through an organization to commit a tortious act*." Red Hed Oil*, 292 F. Supp. 3d at 777. Nothing comparable appears in Hall's pleading. The Complaint fails to allege any facts indicating the defendants collaborated, gave substantial assistance to one another to achieve a tortious result, knowledge of any parties' breach of duty, or any agreement between the defendants that has had an adverse effect on the Plaintiff. Count XIII fails to state a plausible concert-of-action claim and as such it must be dismissed.

**7**

Count XIV alleges that Defendant. Hodgdon and MTX  "were engaged in a joint enterprise with respect to the allegation herein. . . . there was a common pecuniary interest among each Defendant named . . . [and] each had a voice and/or role in the execution of their common interest."  [R.  20 at 22.]  "The essential elements of a joint enterprise include: (1) an express or implied agreement among the alleged co-venturers; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose among the members; and (4) an equal right to a voice in the control of the enterprise."  *Chelsey v. Abbott*, 524 S.W.3d 471, 487 (Ky. 2017).

24

For the same reasons Hall's concert-of-action claim fails, so too does his joint enterprise claim.  As explained in the Court's conclusion in its prior Memorandum Opinion and Order [R. 72], Hall simply restates the elements for joint enterprise, without adding one iota of factual allegations.  [R. 20 at 22.]  Accordingly, Count XIV must be dismissed.

**8**

Finally, Hodgdon seeks the Hall's request for punitive damages be dismissed.  [R. 66 at 18.].  "Under Kentucky law, punitive damages are available only if a defendant acted with oppression, fraud, malice, or gross negligence."  *Zachery v. Shaw*, No. 3:12-CV-606, 2013 WL 1636385, at *1 (W.D. Ky. Apr. 16, 2013).  In his Amended Complaint, Hall asserts that "[t]he conduct of the Defendants in each of these paragraphs and allegations was so malicious, willful, wanton, reckless and grossly negligent that the Plaintiff is entitled to an award of punitive damages."  [R. 20 at 23.]

Taking all the allegations in light most favorable to Plaintiff, as it must do at this stage of the proceedings, the Court finds that Hall has not alleged facts that could give rise to an inference that Hodgdon's actions rise to the requisite level of "oppression, fraud, or malice."  Ky. Rev. Stat. Ann. § 411.184.  Hall has not provided any factual allegations, beyond a recitation of the standard for punitive damages, that would support a finding that Hodgdon acted with the requisite level of "oppression, fraud, or malice."  It is not the job of the Court to supply facts which counsel has failed to adequately plead.  Therefore, on the face of the Amended Complaint, Hall has not provided the requisite factual allegations to state a viable claim for punitive damages.  Hodgdon's Motion to Dismiss the Plaintiff's request for punitive damages as it relates to the remaining common law claims is granted.

### III

Accordingly, and the Court being sufficiently advised, it is hereby **ORDERED** as follows:

1. Hodgdon Powder Company's Motion to Dismiss **[R. 66]** is **GRANTED IN PART** and **DENIED IN PART**

2. Counts V, XI, XII, XIII, XIV of the Amended Complaint [R. 20], as well as the Plaintiff's request for punitive damages, are **DISMISSED** as to Hodgdon Powder Company.

This the 22nd day of July 2025.

Gregory F. Van Tatenhove
United States District Judge